UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

RUBEN SLACKS,

                                Plaintiff,

        vs.                                      9:07-CV-510
                                                        (NAM/GJD)

GEORGE GRAY, et al.

                                Defendants.

_____

RUBEN SLACKS
92-A-6182
Eastern NY Correctional Facility
Napanoch, New York 12458
Plaintiff, *Pro Se*

ANDREW M. CUOMO
Attorney General of the State of New York      Shoshanah V. Bewlay
The Capitol                                 Christina L. Roberts-Ryba
Albany, New York 12224                  Asst. Attorneys General
Attorney for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

      This matter has been referred to the undersigned for Report and

Recommendation by the Honorable Norman A. Mordue, Chief United States District

Judge pursuant to 28 U.S.C. § 636 (b) and Local Rules N.D.N.Y. 72.3(c).

      In this civil rights complaint, plaintiff alleges that he was assaulted by

defendants Gray, Farrell, and Fischer, while defendant Hauck watched, but failed to

intervene.  Plaintiff also claims that he was denied medical care by defendant Nurse

Anthony, and that plaintiff was deprived of clothing and toilet paper over night.

Plaintiff also alleges that he was later improperly charged with misbehavior to cover up the assault. Compl. (Dkt. No. 1). Plaintiff seeks substantial monetary relief.

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 48). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt. Nos. 49, 51). For the following reasons, this court will recommend granting the summary judgment motion and dismissing plaintiff's complaint in its entirety as against all defendants.

## DISCUSSION

### 1.    Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of

2

a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006)(citing *Celotex Corp.*, 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings.  *Id*.

The Local Rules of the Northern District of New York provide that a motion for summary judgment shall include a Statement of Material Facts, "containing each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." LOCAL RULES NDNY 7.1(a)(3).  The "record" for purposes of the Statement of Material Facts includes the "pleadings, depositions, answers to interrogatories, admissions, and affidavits." *Id*.  The Second Circuit has held, however, that in determining whether the moving party has met its burden, the court may not rely solely on the statement of undisputed facts, it must be satisfied that the citation to evidence in the record supports the assertion. *Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party fails to meet its burden, the court must deny summary judgment even if the opposing party does not present any opposing evidentiary matter. *Id*. (citation omitted).

However, if the moving party satisfies its burden, the nonmoving party must

move forward with specific facts showing that there is a genuine issue for trial. *Id*. A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, while a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

## 2.    **Facts**[1]

Plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), claims that on December 3, 2006, he was on his way to the yard at Eastern Correctional Facility (Eastern), when Corrections Officer (CO) True stopped plaintiff and told him that he was going to be "pat-frisked." Compl. ¶ 1. Plaintiff states that after the frisk was completed by Officers True and Olszewski, plaintiff noticed that one of his bags was not returned to him. Compl. ¶ 2. When plaintiff inquired about the bag, CO True told plaintiff that the bag was contraband. *Id.* Plaintiff states that when he questioned CO True's statement, plaintiff was told that he had "too much of an attitude" and was going to be sent back to his cell. *Id.*

---

[1] On August 27, 2008, Chief Judge Mordue denied plaintiff's motion for summary judgment. (Dkt. No. 47). This court has adopted the facts as stated in Judge Mordue's order and has added the evidence that has been presented in the defendants' papers.

Plaintiff states that he was escorted back to his cell by CO True. *Id.*  Plaintiff claims that when they got back to the cell block, CO True told plaintiff that he was going to be keeplocked,[2] however, the block officer told CO True that he was going to have to "lock [plaintiff] in himself because there were no other officers on the block to do so." Compl. ¶ 3.  As a result, plaintiff states that he was taken "up the stairs" to a different area and "locked in" by CO True. *Id.*  Plaintiff claims that at approximately 10:20 a.m., the cell door opened, he was handcuffed, and escorted to the Special Housing Unit (SHU) by defendant Fisher and three other officers who have not been named as defendants. *Id.*

Plaintiff claims that when they arrived at SHU, he saw various officers, including defendants Gray, Farrell, and Hauck. *Id.*  Plaintiff states that he noticed that defendant Gray was putting on, what appeared to be, leather gloves. *Id.* Plaintiff states he was then told to follow defendant Gray into the "frisk room," accompanied by defendants Fisher and Farrell while defendant Hauck stood in the doorway. *Id.* Once inside the "frisk room," plaintiff claims that he was told to place his hands up against the wall, and his glasses were taken away from him by defendant Gray. Compl. ¶ 4. Plaintiff then describes how defendant Gray began punching plaintiff until plaintiff fell to the ground, where plaintiff was "slapped in [the] head and kicked in [the] back, buttocks, and leg area" by defendants Fisher and Farrell. *Id.* Defendant Hauck allegedly stood by and watched the assault without intervening to stop the abuse.

---

[2] The term "keeplock" refers to disciplinary or administrative confinement in which an inmate is confined to his own cell. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989).

Plaintiff claims that when the beating stopped, defendant Fisher told plaintiff to get up, but plaintiff could not comply with the order because the beating aggravated plaintiff's back injury. Compl. ¶ 5.  Plaintiff claims that defendant Fisher stated that defendant Nurse Anthony told him that there was nothing wrong with plaintiff's back, and then defendant Fisher kicked plaintiff in the back again. *Id.*  Plaintiff claims that the abuse continued as defendant Farrell dragged plaintiff on the floor and then picked plaintiff up and "slammed" him against the wall. *Id.*  Plaintiff claims that defendant Nurse Anthony was called, but that she did not give plaintiff any medical care, rather, she just looked at him and stated "that's a refusal." *Id.*

Plaintiff states that ultimately his clothes were taken away from him and he was forced to spend the night with no clothes and no toilet paper.  Plaintiff states that after the incident on December 3, 2006, Nurse Nordé visited plaintiff and asked if he was injured. Compl. ¶ 4. Plaintiff claims that he told Nurse Nordé that he was injured, and although she asked if he wanted medication for the pain, plaintiff told the nurse that he already had a prescription for pain medication, so she only gave him Bacitracin for the laceration on his elbow. *Id.*

Plaintiff states that the next day, someone from "Mental Health" came to visit plaintiff to interview him. Compl. ¶ 6.  Plaintiff claims that this individual told plaintiff that defendant Fisher reported that plaintiff was going to kill himself. *Id.* Plaintiff claims that when he told the mental health professional that the statement was a lie, the clinician told the officer to immediately give plaintiff back his clothes. *Id.* Plaintiff states that despite this order, he did not get his clothes, mattress, sheets, and

blanket back until approximately five hours later. *Id.*  Plaintiff also claims that he told Superintendent Brown about the incident, but that Superintendent Brown told plaintiff that his officers did not "beat up on inmates." Compl. ¶ 7.

Plaintiff states that Sergeant Green came to take photographs of his injuries. Plaintiff claims that he was given two fabricated misbehavior reports, one of which alleged that plaintiff banged his own head against the wall during the frisk. *Id.* Plaintiff names CO George Gray; CO Thomas Farrell; Sergeant Ronald D. Fisher; Lt. Raymond Hauck; and Nurse Nancy Anthony as defendants.

Defendants' description of the events of December 3, 2006 is very different than plaintiff's statement.  The defendants all agree that plaintiff was escorted to the SHU on December 3, 2006[3].  (Fisher Decl. ¶ 7; Farrell Decl. ¶ 4; Gray Decl. ¶ 7). Defendant Gray states that when inmates are admitted to SHU, they are "strip frisked" and searched with a metal detector.  (Gray Decl. ¶ 6).  Defendant Gray explains that the

> purpose of the strip frisk is to maintain security and insure that there are
> no weapons or contraband on the inmate.  A strip frisk involves the
> inmate placing their hands on the wall and then following the directions
> to remove clothing. After the strip frisk is conducted, a nurse is called
> into the room in order to examine the inmate.

*Id*. Defendant Fisher states that when inmates are admitted to SHU, they are also screened for Suicide Prevention. (Fisher Decl. ¶ 6).  The screening consists of asking

---

[3] Defendant Gray's declaration states that plaintiff was escorted to the SHU on December 3, 2008. (Gray Decl. ¶ 7). This incorrect date appears to be a typographical error.  There is no debate that plaintiff's allegations relate to events that occurred on December 3, 2006.

the inmate a series of questions.  (Fisher Decl. ¶ 6).

### A.  Defendant Gray

Defendant Gray states that upon plaintiff's arrival in SHU, plaintiff was taken to

the SHU frisk room, and his restraints were removed. (Gray Decl. ¶ 8).  Plaintiff was

then ordered to place his hands on the wall.  *Id*.  Plaintiff refused to comply with the

order, claiming that he could not comply because of a back injury. (Gray Decl. ¶ 9;

Fisher Decl. ¶ 8).  Plaintiff was again ordered to place his hands on the wall, but

instead, he started to bang his head on the wall and fell to the floor. (Gray Decl. ¶ 10).

Plaintiff was ordered to stand up and comply with the frisk procedure, but he refused.

(Gray Decl. ¶ 11).  Defendant Gray states that defendant Hauck then ordered the

plaintiff to comply with the order to get up and place his hands on the wall, and

plaintiff complied. (Gray Decl. ¶ 12).  Defendant Gray states that defendant Nurse

Anthony came to SHU to examine the plaintiff, but the plaintiff refused to speak to

her. (Gray Decl. ¶ 13).

Defendant Gray states that he did not kick or hit plaintiff at any time during the

incident. (Gray Decl. ¶ 16).  Defendant Gray also states that if he had witnessed "any

sort of assault on the plaintiff," an unusual incident report would have been filed.

(Gray Decl. ¶ 17).  Defendant Gray states that "there was no assault on the plaintiff

whatsoever." (Gray Decl. ¶ 18).

### B. Defendant Fisher

Defendant Fisher states that he heard plaintiff refuse to comply with the strip frisk because of a "bad back." (Fisher Decl. ¶ 8).  Plaintiff "continued to refuse the strip frisk and he began to bang his head against the wall." (Fisher Decl. ¶ 9). Defendant Fisher states that he observed plaintiff fall to the floor, and then refuse several orders to comply with the frisk procedures. (Fisher Decl. ¶ 10).  Defendant Fisher then ordered plaintiff to comply with proper procedures, while the other officers attempted to help plaintiff get on his feet.  (Fisher Decl. ¶ 11).  Defendant Fisher observed defendant Hauck order the plaintiff to stand up, and plaintiff complied. (Fisher Decl. ¶ 12-13).  Defendant Fisher then questioned the plaintiff about whether he had any injuries "from banging his head on the fall to the floor." (Fisher Decl. ¶ 14).  Defendant Fisher claims that plaintiff stated that he had no injuries. (Fisher Decl. ¶ 15).

Defendant Fisher then completed the "Suicide Prevention Screening Guidelines-SHU Admission Form." (Fisher Decl. ¶ 17 & Ex. A).  Defendant Fisher states that "[i]n response to questions such as, 'Are you feeling suicidal' or 'Do you feel there is nothing to look forward to in the future', plaintiff responded, 'Yes.'" (Fisher Decl. ¶ 18).  Defendant Fisher noted on the form "that plaintiff appeared to be under the influence of alcohol or drugs, was incoherent or otherwise acting in an abnormal manner." (Fisher Decl. ¶ 19).  Plaintiff was placed on suicide watch "due to

9

his claims of possible harm," and that the Mental Health Unit was notified. (Fisher

Decl. ¶ 20).  Plaintiff remained on suicide watch until December 4, 2006.  (Fisher

Decl. ¶ 21(a)[4]).  Defendant Fisher states plaintiff continued to behave abnormally

throughout the evening. (Fisher Decl. ¶ 21(b)).

Plaintiff reported injuries to a nurse at approximately 7:30 p.m. on December 3,

2006. (Fisher Decl. ¶ 22).  Plaintiff claimed that he had injuries to his right rib cage

and right elbow, inflicted by C.O. Gray.[5] (Fisher Decl. ¶ 23).  Defendant Fisher states

that he notified another corrections officer, who then attempted to photograph

plaintiff's injuries, but plaintiff refused to leave his cell. (Fisher Decl.¶¶ 25, 26).  The

photographs were taken the following day. (Fisher Decl. ¶ 27).  Defendant Fisher

states that he was present for the entire strip frisk procedure on December 3, 2006, and

that plaintiff was never hit by defendant Gray or any other corrections officer. (Fisher

Decl. ¶ 29).

## C.  Defendant Farrell

Defendant Farrell states that plaintiff was taken to the strip frisk room, and that

plaintiff refused to place his hands on the wall after the restraints were removed.

(Farrell Decl. ¶ 5-6).  Defendant Farrell states that plaintiff stated he could not put his

---

[4]Defendant Fisher's Declaration includes two paragraphs labeled Number 21.  For purposes of this Order, the court labels the first one "(a)", and the second one "(b)".

[5] In his declaration, defendant Fisher states that plaintiff complained of injuries "sustained *by* C.O. Gray," (Fisher Decl. ¶ 23), however, it is clear that plaintiff was complaining about his own injuries.  There is no indication that defendant Gray suffered any injuries.

hands on the wall because of a back injury. (Farrell Decl. ¶ 6).  Defendant Farrell

agrees with the other defendants that plaintiff refused a second order to comply, began

banging his head on the wall, fell to the floor, and then began banging his head on the

floor. (Farrell Decl. ¶ 7).  Plaintiff continued to refuse orders to stand up until

defendant Hauck gave the order to do so. (Farrell Decl. ¶ 8-9).  Defendant Farrell

states that plaintiff refused to speak with defendant Nurse Anthony when she arrived

to examine plaintiff. (Farrell Decl. ¶ 10).

Defendant Farrell wrote a misbehavior report against plaintiff, charging him

with "violating direct orders and frisk procedures." (Farrell Decl. ¶ 11).  At the Tier III

disciplinary hearing, plaintiff admitted that he banged his head on the floor and the

wall. (Farrell Decl. ¶ 15).  Defendant Farrell states that he never hit or kicked the

plaintiff during the incident, and that "there was no assault on the plaintiff

whatsoever." (Farrell Decl. ¶¶ 21, 22).

### D.  Defendant Hauck

Defendant Hauck has been a Corrections Lieutenant at Eastern Correctional

Facility since 2003 and has been employed by DOCS for over 25 years. (Hauck Decl.

¶¶ 2, 3).  Defendant Hauck's duties include supervising all lower-ranking uniformed

officers, serving as a Watch Commander, and supervising all Sergeants and Officers

on a given shift. (Hauck Decl. ¶ 4).  On December 3, 2006, defendant Hauck was

working the day-shift at the facility. (Hauck Decl. ¶ 6).  Defendant Hauck states that in

11

order to refresh his recollection regarding this incident, he reviewed a memorandum

he wrote to Captain Leghorn regarding plaintiff. *Id.* & Ex. B.[6]   Defendant Hauck

recalls that on arrival at the SHU, plaintiff "was very argumentative, [and] refused to

comply with the strip frisk claiming he had back problems." (Hauck Decl. ¶ 8).

Defendant Hauck states that

> At the time the plaintiff was admitted to SHU, no staff struck him.  In fact
> the staff stopped the plaintiff from banging his head on the wall.  The
> plaintiff then let himself fall to the floor, claiming his back went out.
> Once on the floor he began banging his head on the floor.  The Officers
> attempted to stop him from doing this.

(Hauck Decl. ¶ 9).  Defendant Hauck states that if he witnessed an assault on an

inmate, he would immediately intervene to stop the assault. (Hauck Decl. ¶ 10).

Defendant Hauck states that "at no time was the plaintiff assaulted by Correction

Officers." (Hauck Decl. ¶ 11).  Defendant Hauck asserts that any injuries that the

plaintiff sustained on December 3, 2006 were related to his own "destructive

behavior." (Hauck Decl. ¶ 12).

### E.  Defendant Nurse Anthony

Defendant Anthony is a registered nurse, who has been employed by DOCS for

18 years. (Anthony Decl. ¶ 2).  Some of defendant Anthony's duties include

examining inmates when they are admitted to SHU if requested to do so by the

---

[6] Exhibit B to defendant Hauck's declaration is a copy of the memorandum that he wrote
to Captain Leghorn.

security staff. (Anthony Decl. ¶ 4).  Defendant Anthony states when an inmate is being

admitted to SHU, he is first strip-frisked by the officers, and then if there is no

incident, the inmate is routinely examined by a nurse that is working the evening shift.

(Anthony Decl. ¶¶ 5-6).  Sometimes, however, a nurse is called into SHU during the

day in order to examine an inmate. *Id.* ¶ 6.

When defendant Anthony examines an inmate admitted to SHU, she asks a

series of questions regarding the inmate's general health, whether the inmate has

allergies, whether he is taking any medications, and whether he has any injuries.

(Anthony Decl. ¶ 7).  Defendant Anthony states that if she notices that an inmate has

injuries or claims that he has been physically assaulted, she notes the injuries in the

inmate's Ambulatory Health Record (AHR). *Id.* ¶ 8.

In this case, defendant Anthony states that she examined plaintiff on December

3, 2006 at approximately 11:05 a.m. (Anthony Decl. ¶ 10).  Defendant Anthony states

that plaintiff refused to answer any of her questions. (Anthony Decl. ¶ 11).  The

excerpt of plaintiff's AHR submitted with defendant Anthony's declaration shows that

defendant Anthony documented plaintiff's examination, noting "no abrasions,

contusions, or lacerations." (Anthony Decl. ¶¶ 11-12 & Ex. A) (AHR entry dated

12/3/06 at 11:05 a.m.).  The AHR shows that Nurse Nordé examined plaintiff at

approximately 7:10 p.m.  (Anthony Decl. ¶ 13 & Ex. A)(AHR entry of 12/3/06 at 7:10

p.m.).  Nurse Nordé documented a "small laceration R elbow," and stated that plaintiff

13

complained of pain in his right ribs. *Id*.  Nurse Nordé cleansed the laceration with iodine and issued plaintiff some bacitracin ointment. *Id.* She also wrote that she would order an x-ray for plaintiff the following morning. *Id*.  She noted that although plaintiff had no history of hypertension, his blood pressure was 140/102, and she would be checking the blood pressure two times per week while he was in SHU. *Id.*

On December 4, 2006, a DOCS employee photographed plaintiff.  (Fisher Decl. Ex. C at 1).  The first four photographs show plaintiff standing in boxer shorts. (Fisher Decl. Ex. C at 2).  The last two photographs are close-up photographs of the small laceration on plaintiff's left elbow, and a view of plaintiff's right side.  (Fisher Decl. Ex. C at 3). The photograph of plaintiff's right side show plaintiff pointing at some red marks on his upper right rib cage.  *Id*.

A form titled "X-Ray Requisition and Report" shows that Nurse Nordé ordered an x-ray of plaintiff's right ribs. (Anthony Decl. Ex. C).  On December 12, 2006, the radiologist wrote that three views of the right rib cage "show[] no recent displaced right rib fracture.  Right lung expanded & no right pleural effusion.  IMP: NO RECENT DISPLACED RIGHT RIB FRACTURE SEEN." *Id*.

Defendant Anthony concludes that plaintiff caused his own injuries while he was in the SHU cell on December 3, 2006. (Anthony Decl. ¶ 18).  Defendant Anthony bases her opinion on the fact that plaintiff had no injuries when defendant Anthony examined him at 11:05 a.m., but when Nurse Nordé examined him again at 7:10 p.m.,

14

he had a small laceration on his elbow. *Id.*

3.   **Medical Care**

In order to state an Eighth Amendment claim based on constitutionally

inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs." *Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate

indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The

first element is objective and measures the severity of the deprivation, while the

second element is subjective and ensures that the defendant acted with a sufficiently

culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d

698, 702 (2d Cir. 1998)).

In order to meet the first element of the standard, plaintiff must show that he has

a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9

(1992).  A medical condition has been considered "sufficiently serious" when there is

a "condition of urgency," one that may result in death, degeneration, or extreme pain.

*Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  The seriousness of a

plaintiff's medical need may also be determined by reference to the effect of denying

the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services*,

151 F. Supp. 2d 303, 310 (S.D.N.Y. 2001)(citation omitted).  Thus, if unnecessary and

wanton infliction of pain results from the denial of treatment, or if the denial of

15

treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious."  *Id.* (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care.  *Id.* (citing *Estelle*, 429 U.S. at 105-106).  Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition.  *Id.*  In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702).  The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference.  *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. Sonds, 151 F. Supp. 2d at 311.  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates.  *Id.* (citations omitted).  An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the

need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107).  Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate.  *Id.  See also Daniels v. Williams*, 474 U.S. 327, 332 (1986)(negligence not actionable under Section 1983).  Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff's only claim against defendant Anthony is that she did not give him any medical care after the alleged assault. Compl. ¶ 5.  The entire claim consists of one sentence in the complaint, stating that when defendant Anthony finally arrived in the room, she looked at plaintiff, stated "that's a refusal," and left. *Id.* Defendant Anthony states that plaintiff refused to answer any questions regarding his condition which would be consistent with her making the comment that plaintiff attributes to her.  The medical records are also consistent with defendant Anthony's statement.  The AHR entry for 11:05 a.m. on December 3, 2006 merely states that defendant Anthony was asked by "security" to examine plaintiff, but he refused to answer any questions. (Anthony Decl. Ex. A).  Her "assessment" was that she observed no abrasions, contusions, or lacerations. *Id.*

In his response to defendants' motion, plaintiff claims that to the extent that the medical records show that Nurse Anthony provided plaintiff medical attention on

December 3, 2006, defendant Anthony must have falsified this information.[7] (Dkt. No. 49 at ¶ 5).  It is unclear what plaintiff means by "medical attention," but defendant Anthony only recorded what she observed.  Assuming that she made the observation that there were no abrasions, contusions, or lacerations, then no "medial attention" was required.  There is no claim by defendant Anthony that she did anything else.[8]  Thus, plaintiff's accusation that defendant Anthony must have falsified records is completely unfounded.

In his response to defendants' motion, plaintiff also states that defendant Anthony's behavior was "way below professional" and was in violation of DOCS regulations governing the administration of treatment to inmates. *Id.* ¶ 11.  Even assuming that defendant Anthony's behavior  was "unprofessional," negligent, or in

---

[7] The court notes that in defendants' reply, they argue that plaintiff failed to properly respond to the defendants' motion. (Dkt. No. 51).  They argue that plaintiff did not match his numbered paragraphs to the paragraphs in defendants' statements, and that plaintiff did not cite to specific portions of the record. *Id.*  Defendants stated that for this reason, the defendants' Statement of Material Facts" should be deemed admitted. *Id.*  The court need not decide this issue, particularly since plaintiff is *pro se*, the court has considered plaintiff's response, and finds that even considering his response, he has not raised a genuine issue of material fact.

[8] Plaintiff seizes upon one of the statements in defendant Anthony's declaration that plaintiff believes indicates that defendant Anthony claims to have visited plaintiff again at 7:10 p.m. (Anthony Decl. ¶ 18).  Defendant Anthony states that "[d]ue to the fact that when I examined plaintiff at 11:05 AM on December 3, 2006, the plaintiff had no injuries and *subsequent to my examination the same day at 7:10 PM*, the record indicates that plaintiff had a small laceration to his elbow . . . ."  Plaintiff interprets the highlighted words as defendant Anthony's claim that *she* examined plaintiff at 7:10 p.m.  Although the sentence could be interpreted this way because the sentence itself is unclear, *there is no claim by defendant Anthony that she examined plaintiff at 7:10 p.m.*  Nurse Anthony has stated, and the documents attached to her declaration confirm, that it was Nurse Nordé who examined plaintiff at 7:10 p.m. (Anthony Decl. ¶ 13 & Ex. A).

violation of DOCS rules,[9] this would not rise to the level of a constitutional claim.  As

stated above, negligence is not actionable under section 1983. *Estelle*, 429 U.S. at 107.

Based on the evidence in plaintiff's medical records and by plaintiff's own

testimony, this court does not find that there was any "serious medical need" to satisfy

the first prong of the Eighth Amendment analysis.  During his deposition, plaintiff

stated that his claim against defendant Anthony is that she denied him medical

attention because "she come there, look at me, didn't ask me any questions and leave."

Deposition Transcript (DT) at 103 (Dkt. No. 48, Roberts-Ryba Aff. Ex. A).  Plaintiff

stated that as far as he was concerned, the cut on his elbow was a "serious medical

need" because he was bleeding. (DT at 103).  Plaintiff later stated that he believed that

his elbow laceration was serious because "if a person stay bleeding, he die." (DT at

105).

Although plaintiff claims that defendant Anthony did not give him "medical

attention" when she saw him at 11:05 a.m. on December 3, 2006, he admitted during

his deposition that at 7:10 p.m. the same day, Nurse Nordé gave him proper medical

care. (DT at 104).  This "proper medical care" consisted of cleansing a "small

laceration" with iodine, issuing plaintiff some bacitracin ointment, and ordering x-

---

[9] This court makes no such finding.

rays[10] based on plaintiff's complaint of pain in his right rib area. (Anthony Decl. Ex. A).  There is no notation by Nurse Nordé that plaintiff had been bleeding extensively or bleeding at all.  The laceration was ***small*** and required only cleansing and antibiotic ointment.

The SHU Entrance Form, completed by Nurse Nordé shows that plaintiff had a history of back pain, and he was already receiving prescription pain medication for his back. (Anthony Decl. Ex. B).  Plaintiff testified that Nurse Nordé asked him whether he needed some pain medication for the pain in his rib, but plaintiff refused, stating that he did not need any more pain medication since he already had some for his pre-existing "back problem." (DT at 104).  Plaintiff had x-rays taken on December 12, 2006, and the x-ray report stated that there were no fractures, the right lung was expanded, and there was no right pleural effusion.[11] (Anthony Decl. Ex. C).

While plaintiff argues that x-rays would not show if the consistent punching had bruised plaintiff, he stated at his deposition that did not sustain any internal injuries. (DT at 105).  Plaintiff stated that he knew that his ribs were "bruised" because there was a "red mark."  (DT at 112).  However, he also stated that although the red mark lasted two to three days, it never "bruised" at all. (DT at 112).  Photographs taken of

---

[10] The x-ray requisition report shows that the x-rays were ordered on "12/3/06," the same date as the incident. (Anthony Aff. Ex. C).

[11] Pleural effusion is an accumulation of excess liquid in the lung, which can be caused by trauma. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 489-93 (18th Ed. 2006).

plaintiff on December 4, 2006 confirm that there was no serious bruising. (Fisher Decl. Ex. C at 3).

In *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006), the Second Circuit held that the objective prong of the Eighth Amendment standard requires the court to examine how the defendant's conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the plaintiff. In this case, there is no evidence that defendant Anthony's conduct was "inadequate." However, it is also clear that a condition of urgency did ***not*** exist for which the denial of medical treatment could have resulted in further significant injury or the unnecessary and wanton infliction of pain.

Despite plaintiff's statement that if one continues to bleed, one will die, there is no indication that plaintiff's bleeding, if any, was so severe. Neither the painful rib area, for which plaintiff himself admits he had sufficient pain medication, nor the laceration on his elbow were conditions that could produce death, degeneration or extreme pain. The medical records and plaintiff's own testimony support this finding. Plaintiff testified that after the x-rays, he did not request any follow-up medical care for his injuries, his "red mark" lasted only a couple of days. (DT at 95, 112).

Thus, plaintiff has failed to produce any evidence to contradict the sworn statement of defendant Anthony, corroborated by the clear medical evidence showing that plaintiff did not sustain more than a *de minimis* injury. The medical evidence

includes the report of Nurse Nordé, who plaintiff admits gave plaintiff "proper medical care."  If the "proper medical care" consisted of cleansing the minor laceration on plaintiff's elbow and issuing some bacitracin ointment, then plaintiff did not have a "serious medical need" within the meaning of the Eighth Amendment.

Finally, regarding the alleged rib injury, the most that Nurse Anthony could have done was schedule x-rays, which were still scheduled for plaintiff the same day by Nurse Nordé.  The x-rays confirmed that plaintiff had no rib injury, and no injury to his lung.  Plaintiff testified that he had no internal injuries, and the "red mark" disappeared in approximately two days.  There is absolutely no evidence to show that plaintiff had a "serious medical need" to which defendant Anthony could have been "deliberately indifferent."  Because the court has determined that plaintiff did not have a serious medical need, it need not reach the second prong[12] of the Eighth Amendment analysis, and the complaint may be dismissed as against defendant Anthony.

---

[12] Defendant Anthony's alleged actions, consisting of her statement that plaintiff's behavior constituted a "refusal" of care, justifying her failure to afford him proper medical care, would be part of the second prong of the Eighth Amendment test.  If plaintiff had no "serious medical need," then defendant Anthony's attitude is no longer relevant to the analysis.  Having said this, however, the court would point out that at plaintiff's disciplinary hearing, he testified that after the incident, the defendant officers told plaintiff that they had called the nurse, and plaintiff said "nothing's wrong.  *I refuse*." (Farrell Decl. Ex. B at 10)(Transcript of Disciplinary Hearing of Dec. 14, 2006)(emphasis added).  Plaintiff then stated that when the nurse entered, "she just looked at me and said I refuse to talk to him and walked off." *Id.*  It is clear from plaintiff's own testimony that shortly before defendant Anthony came into the room, plaintiff was telling the guards that "nothing" was wrong, and he did not need to see the nurse.  It is thus, possible that when defendant Anthony came into the room, plaintiff did refuse to speak with her or answer her questions.

**4.    Excessive Force**

The Second Circuit has recently discussed the analysis of a claim for use of excessive force. *Wright v. Goord*, 554 F.3d 255, 268-69 (2d Cir. 2009).  The court must first identify the constitutional right that was infringed by the "challenged application of force." *Id.* at 268 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). After determining that the constitutional right involved is the Eighth Amendment ban on cruel and unusual punishment, the court must judge the validity of the plaintiff's claim by reference to the "specific constitutional standard," and not to "some generalized excessive force standard." *Id.* (quoting *Graham*, 490 U.S. at 394))(internal quotation marks omitted).

An Eighth Amendment claim of cruel and unusual punishment has two components, one subjective and one objective. *Id.*  The subjective component focuses on the ***motive*** for defendants conduct, and requires a showing that the defendant had the necessary "level of culpability," shown by actions that exhibit "wantonness" in light of the particular circumstances surrounding the challenged conduct. *Id.*(citing *inter alia Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  The determination of whether action is "wanton" turns upon whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 7; *Whitely v. Albers*, 475 U.S. 312, 320-21 (1986)(quoting *Johnson v. Glick*,

481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033 (1973)).

The objective component focuses on the harm done, and the defendants'

conduct must be "'inconsistent with the contemporary standards of decency' and

'repugnant to the conscience of mankind.'"*Whitely*, 475 U.S. at 327.  The court must

ask itself whether the alleged conduct was objectively "harmful enough to establish a

constitutional violation." *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at

8)(internal quotation marks omitted).  However, where the defendants' use force

maliciously and sadistically, the "contemporary standards of decency" are always

violated, whether or not a "significant injury" occurs. *Id.* at 268-69 (quoting *Hudson*,

503 F.3d at 9).

Thus, where a prisoner's claims, together with his evidentiary proffers could

"reasonably, if credited, allow a rational fact finder to find that corrections officers

used force maliciously and sadistically," then summary dismissal is not appropriate.

*Id.* at 269.  The court in *Wright* emphasized that the prohibition against cruel and

unusual punishment does ***not*** extend to ***de minimis*** uses of physical force, provided

that the use of force is not "repugnant to the conscience of mankind." *Id.* (quoting

*Hudson*, 503 U.S. at 10).

The lack of a serious injury is "relevant," but does not end the inquiry. *Hudson*,

503 U.S. at 7.  The extent of the injury must be considered "in context." *Scott v.*

*Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).  The court must determine the need for

the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely*, 475 U.S. at 321.

In this case, plaintiff has alleged an excessive use of force in the SHU on December 3, 2006 by defendants Gray, Fisher, and Farrell, while defendant Hauck stood by and watched the assault. Defendants admit that they were present during plaintiff's admission to the SHU, but they deny that they used any force whatsoever against plaintiff.

### A.  Defendant Hauck

Defendants first argue that the case should be dismissed against defendant Hauck because plaintiff has not shown that this defendant was "personally involved" in the alleged incident, even though plaintiff claims that defendant Hauck stood at the doorway and watched the alleged assault. (Def. Memorandum of Law at 12-13)(Dkt. No. 48). Defendants argue that plaintiff has failed to show that defendant Hauck participated in, encouraged, condoned, or was even present during the alleged assault. *Id.* at 12. Defendants cite plaintiff's deposition testimony during which he stated that defendant Hauck watched the assault, but when asked whether defendant Hauck left the doorway at any time, plaintiff stated that he did not "think" that defendant Hauck left. *Id.* (citing DT at 102).

25

Plaintiff has not accused defendant Hauck of participating in the alleged beating.  Plaintiff claims that defendant Hauck watched the assault from the door of the strip-frisk room.  However, plaintiff does not need to "establish" that defendant Hauck was present during plaintiff's admission to SHU because defendant Hauck himself ***admits*** that he was present. (*See* Hauck Dec'l).  Defendant Hauck describes in detail observing plaintiff bang his head on the wall, fall to the floor, and bang his head on the floor. (Hauck Decl. ¶ 9).  The other defendants state that plaintiff did not get up until defendant Hauck ordered him to do so. (Farrell Decl. ¶¶ 8-9; Gray Decl. ¶ 12; Fisher Decl. ¶¶ 12-13).  Thus, it is clear that defendant Hauck was present throughout the incident.

While plaintiff does not claim that defendant Hauck participated in the alleged excessive use of force, he claims that defendant Hauck failed to intervene while the other officers were using excessive force.  "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Riccuiti v. N.Y.C. Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997); *O'Neill v. Krzeminski*, 839 F. 2d 9 (2d Cir. 1988) (citations omitted).

An officer who fails to intervene is liable for the harm that could have been prevented, caused by the actions of the other officers, where that officer observes or has reason to know that excessive force is being used. *Anderson v. Branen*, 17 F.3d

26

552, 557 (2d Cir. 1994).  Liability attaches where there was "a realistic opportunity to intervene to prevent the harm from occurring." *Id*.  This rule for law enforcement officers extends to corrections officers.  *Parker v. Fogg*, 85-CV-0177, 1994 U.S. Dist. LEXIS 1696, at *8 (N.D.N.Y. Feb. 17,1994) (McCurn, J.).  An officer is excused from liability, despite his presence, if the assault is "sudden and brief," such that there is no real opportunity to prevent it.  *Ricciuti*, 124 F.3d at 129; *Fogg*, 1994 U.S. Dist. LEXIS 1696, at *8.

Because plaintiff alleges that defendant Hauck was at the door of the strip-frisk room during the incident, and defendant Hauck admits being present during the incident, *if* excessive force had been used against plaintiff, then defendant Hauck would have been responsible for failure to intervene.  Thus, this court will not recommend dismissal based on the lack of personal involvement of defendant Hauck and will proceed to consider the merits of the plaintiff's excessive force claim.

### B.  Defendants Gray, Farrell, and Fisher

As stated above, the defendants' version of the incidents of December 3, 2006 is very different from plaintiff's description.  Credibility determinations and choices between conflicting versions of the events are matters for a jury and not for the court on summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citing *inter alia Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255).  There is a very narrow exception to the rule as stated by the Second Circuit in *Jeffreys v. City of New York*,

426 F.3d 549, 553-55 (2d Cir. 2005).  In *Jeffreys*, the court held that a court may grant

summary judgment in the rare circumstance where there is nothing in the record to

support plaintiff's allegations, other than his own contradictory and incomplete

testimony, and even after drawing all inferences in the light most favorable to the

plaintiff, the court determines that "no reasonable person" could believe the plaintiff's

testimony. *Id.* at 554-55.

In *Jeffreys*, the Second Circuit cited with approval the district court's opinion in

*Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 468-71 (S.D.N.Y. 1998). *Jeffreys*, 426

F.3d at 555.  In *Aziz*, then-District Judge Sonia Sotomayor granted summary judgment

in an excessive force case, relying upon the absence of any evidence in the record that

corroborated the plaintiff's version of the events, and highlighting the "many

inconsistencies and contradictions within the plaintiff's deposition testimony and

affidavits." 994 F. Supp. at 470.  The court in *Aziz* found that when the facts alleged

by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the

court may "pierce the veil of the complaint's factual allegations . . . and dismiss the

claim." *Id*.

The court in *Jeffreys* also distinguished a case in which the Second Circuit

reversed the grant of summary judgment in a case in which plaintiff's testimony that

he was beaten was supported by photographs showing severe bruises, hospital records

showing that he had fractures of the head; by a physician's opinion that plaintiff's

28

injuries were consistent with having been kicked in the head; and that the plaintiff's

eye socket fracture could not have been self-inflicted. *Jeffreys*, 426 F.3d at 554-55

(distinguishing *Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir. 1997)).

This court finds that this case is one of those rare exceptions in which plaintiff's

allegations are inconsistent throughout the record; there is absolutely no medical

evidence to corroborate plaintiff's multiple versions of the events; and a review of the

entire record shows that no reasonable person could believe plaintiff's allegations.

Plaintiff's multiple versions of the events include his disciplinary hearing testimony,

during which he states that defendant Gray punched plaintiff once, causing plaintiff to

fall to the floor, and then defendant Gray punched plaintiff once more after plaintiff

got up off the floor, causing plaintiff to fall again. (Farrell Decl. Ex. B at 9).

However, plaintiff states that when he got up the second time, he complied with the

frisk procedure, and that is when defendant Anthony was called. *Id.* at 10.  There were

no claims of any additional beating.

During the December 14, 2006 disciplinary hearing, plaintiff also admitted

banging his head against the wall and on the floor. *Id.*  He did state, however, that he

engaged in this behavior so that the defendants would stop beating him.  In his

response to defendants' motion for summary judgment, plaintiff strenuously denies

that he ever banged his head on the wall or the floor, stating that if he had done so,

there would have been swelling or bruising to his head. (Dkt. No. 49-2 ¶ 3; 49-3 ¶ 5;

29

49-4 ¶ 4; 49-6 ¶ 3; 49-7 ¶ 3).[13]   Plaintiff now claims that the tape of the disciplinary

hearing was "erroneously" transcribed to the extent that it contradicts his statement

that he did not bang his head on the wall or the floor. (Dkt. No. 49-3 ¶ 5).

The court notes, however, that plaintiff's claim that the disciplinary hearing was

"erroneously" transcribed is completely implausible because his testimony at the

hearing regarding the issue of him banging his head is not simply one sentence that

could have been misheard. (Farrell Decl. Ex. B at 10-11).   Plaintiff told the hearing

officer an entire story regarding the reason that plaintiff banged his head, and even

stated that "it didn't hurt because they stopped beating on me and then took me back

to my cell." *Id.* at 11.   Defendant Farrell testified at the disciplinary hearing, and

plaintiff simply asked him "wasn't [sic] you the one that slapped me on my head when

I was on the wall." *Id.* at 22.   Defendant Farrell denied slapping plaintiff, but plaintiff

never asked about any another conduct by defendant Farrell.

By the time that plaintiff filed his grievance on December 15, 2006, he alleged

that defendant Gray physically attacked plaintiff and defendants Farrell and Fisher

kicked and slapped plaintiff while he was "on the floor." (Farrell Decl. Ex. C at 5).[14]

However, when plaintiff was interviewed by Lieutenant Schaller for the grievance

---

[13] Plaintiff has responded in opposition to each defendant's declaration.  These citations
are to plaintiff's affidavits in response that are all filed under docket number 49.

[14] Defendants have not numbered the pages of Exhibit C of the Farrell Declaration.  Thus,
the page referred to by the court is simply the fifth page of the exhibit, not counting the
certification of the documents.

investigation, plaintiff stated that he was struck once in the rib area by defendant

Gray, but "he was not struck by any other staff members however Sgt. Fisher and

Officer Farrell were also present in the room and . . . Lt. Hauck was located in the

doorway . . . ." (Farrell Decl. Ex. D at 16)(grievance materials).  The grievance was

denied by the Superintendent because no evidence of physical force was found.[15] *Id.* at

6.

      By the time that plaintiff filed his complaint in this federal action, he stated that

before the alleged assault, defendant Gray put on a pair of leather gloves, plaintiff was

punched twice by defendant Gray, and that after plaintiff fell to the floor, he was

slapped in the head and kicked in his back, buttocks and leg area by defendants Farrell

and Fisher. Compl. ¶ 4.  In the complaint, plaintiff added that when defendant Fisher

told plaintiff to get up, plaintiff stated that he could not get up because of his back

injury, but that defendant Fisher told plaintiff he did not have a back injury and kicked

plaintiff again. Comp. ¶ 5.  Defendant Fisher told defendant Farrell to make plaintiff

stand up, and defendant Farrell dragged plaintiff across the floor causing his elbow to

be bruised and "slammed" plaintiff against the wall. *Id.*  The complaint continues,

stating that after plaintiff put on his SHU clothes, defendant Farrell "yanked my

underpants . . . up so hard that it bruised my tail bone and slapped me in the back of

---

[15] In a memorandum from Captain Leghorn to K. Lucas, the Inmate Grievance Resolution
Committee Supervisor, Captain Leghorn points out the inconsistency between plaintiff's written
grievance and his interview with Lieutenant Schaller. (Farrell Decl. Ex. D at 15).

the head." *Id.*

By the time that plaintiff was deposed in this action, plaintiff claimed that defendant Gray also had kicked plaintiff. (DT at 60, 66).  Plaintiff testified that "other people" started kicking him, and that they kicked him in his back and shoulders. (DT at 62-63).  Plaintiff stated that defendants Gray, Farrell, and Fisher kicked and punched plaintiff while he was on the floor. (DT at 64).  Plaintiff testified that defendant Gray kicked plaintiff more than five times. (DT at 65).  Plaintiff stated that defendant Fisher hit plaintiff on the head while he was down on the floor, and that the defendants kicked plaintiff hard for "two or three minutes." (DT at 68).  Defendant Fisher also slapped plaintiff on the head and told him to get up. (DT at 69).

At plaintiff's deposition, he did not mention the bruised tail bone.  He simply stated that defendant Farrell dragged plaintiff out of the corner, lifted him up by the waist of his pants and his shirt, and pushed plaintiff up against the wall. (DT at 71). At his deposition, plaintiff also elaborated further on the beginning of the story. (DT at 52-56).  Plaintiff testified that after defendant Gray punched plaintiff the first time, defendant Farrell told plaintiff to put his hands back up on the wall, and plaintiff told defendant Farrell that "if CO Gray hit me again, I'm going to take my hands back off the wall." (DT at 54-55). Plaintiff stated that he was coming back off the wall and that he was not going to "be on the wall while he keep [sic] punching me like I'm a punching bag." (DT at 55).  Plaintiff stated that he intended to defend himself, with

32

his fists if necessary. *Id.*  Then plaintiff states that he put his hands back up on the wall, and defendant Gray punched him again. *Id.*  Plaintiff did not make any of these statements earlier.

As an exhibit, defendants have also included the confidential testimony of the psychologist from the Office of Mental Health (OMH), Ed Rudder, who recommended placing plaintiff on the suicide watch on December 3, 2006 after he was told that plaintiff had told the officers that he would be attempting to commit suicide that night.[16] (Roberts-Ryba Aff. Ex. C).  Psychologist Rudder interviewed plaintiff on December 4, 2006. *Id.*  Plaintiff states in his complaint that when he was interviewed by Psychologist Rudder, plaintiff told him that the officers lied when they reported that plaintiff was threatening suicide. Compl. ¶ 6.  Psychologist Rudder testified that plaintiff denied making the suicidal statements, said that he was fine, but that "there must be ***some misunderstanding*** of some nature." *Id.* (emphasis added).  Later plaintiff told Psychologist Rudder that the suicide statement was either a "misunderstanding" or "perhaps it was a fabrication." *Id.*

Psychologist Rudder also testified that he asked the plaintiff about the notation in the log book, stating that plaintiff was banging his head and later that night, was

---

[16] Psychologist Rudder states that he was called at home on Sunday, December 3, 2006, and recommended one-on-one suicide watch until the next morning when Psychologist Rudder went to plaintiff's cell to interview him regarding plaintiff's alleged statement. (Roberts-Ryba Aff. Ex. C at 2).

hiding under his bed. *Id.*  Psychologist Rudder testified that plaintiff "reported that he

was probably feeling frustrated and wanted to get a little attention and stated he was

probably just being a ***little dramatic*** with his behavior to get some attention . . . ." *Id.*

(emphasis added). Plaintiff also told Psychologist Rudder that plaintiff was annoyed

that he had been placed in SHU and felt that the placement was unjust. *Id.*

There was absolutely no discussion of an assault or plaintiff being injured.  In

fact, based on the discussion that plaintiff had with Psychologist Rudder, it appears

that plaintiff reacted with frustration and anger about being placed in SHU, but

plaintiff attempted to make it clear that there was nothing wrong with him mentally.

*Id.*  Plaintiff appears to have adjusted his statements based upon the individual to

whom he was speaking.  Clearly, plaintiff no longer wished to be on suicide watch

because that involved a deprivation of clothing and belongings, thus, when he spoke

to Psychologist Rudder, he stated that everything was fine and that the "suicide"

statement was either a "misunderstanding" or a "fabrication."[17]  When Psychologist

Rudder asked plaintiff why he was banging his head, plaintiff did not tell him that it

was so that the defendants would stop beating him as he alleged during the

disciplinary hearing, rather, plaintiff stated that he was feeling frustrated and annoyed

---

[17] It is unclear from the testimony who plaintiff is stating fabricated the suicide allegation.
However, for purposes of this motion, the court will assume that plaintiff was claiming that one
of the defendants fabricated that statement, rather than as an admission that plaintiff fabricated
the desire to commit suicide.

34

that he had been placed in SHU unjustly.

All of the above evidence, together with the fact that plaintiff had no injuries other than a scraped elbow, shows that this is one of those actions in which a reasonable jury could ***not*** find in plaintiff's favor.  It is completely implausible that if the events happened as plaintiff currently states, that he would not have had more severe injuries or at least some bruising other than a red mark that disappeared in a few days.[18]  At his deposition, plaintiff alleged that the defendants kicked him hard and punched him all over his body, from his legs to his back and shoulders, for a period of ***two to three minutes***. (DT at 68).  Plaintiff claimed that defendant Gray, alone, kicked him more than five times while plaintiff lay on the floor, a claim that plaintiff did not make in the complaint. (DT at 65).

Even assuming that plaintiff may have been treated roughly in an attempt to get him up off of the floor as he was hitting his head, causing the scrape on plaintiff's elbow,[19] rough treatment does not rise to the level of a constitutional violation. *See Santiago v. Campisi*, 91 F. Supp. 2d 665, 674-75 (S.D.N.Y. 2000)(citing cases in

---

[18] The court notes that the SHU Log Book indicates that plaintiff refused to have his pictures taken at 7:50 p.m. on the day of the incident. (Fisher Decl. ¶¶ 24-26 & Ex. B at 7). Defendant Fisher states that after Nurse Nordé informed defendant Fisher that plaintiff was claiming to be injured, defendant Fisher immediately obtained the camera to take pictures, but plaintiff refused. (Fisher Decl. ¶ 24).  The pictures were taken on December 4, 2006 at approximately 11:00 a.m. (Fisher Decl. ¶ 27 & Ex. C).

[19] It is actually unclear how or when the scrape on plaintiff's elbow was caused, but the court will assume for purposes of this motion that plaintiff's elbow was somehow scraped during the incident.

which *de minimis* uses of force did not rise to the level of constitutional violations).  It appears that any conduct that may have resulted in plaintiff's elbow injury was justifiable in an attempt to get plaintiff to stand.  Plaintiff's versions of the events are simply at odds with each other and at odds with the medical evidence.  Plaintiff's statement to the psychologist is consistent with the statements made by the defendants, that plaintiff behaved the way he did because he was frustrated and angry over being placed in SHU for something that he did not think was justified.[20]  Thus, based on all of the evidence, this court would recommend dismissal of the complaint as against defendants Gray, Farrell, Fisher, and Hauck.[21]

**5.**    **Pattern of Civil Rights Violations**

Plaintiff states that his second cause of action is a "pattern of civil rights violations . . ."  Compl. at 5.  Plaintiff argues that the defendants "made their own Rules on Procedures and Practices which involved a pattern of anti-civil rights activity in the Special housing unit are [sic] causing Plaintiff physical injury and denying Medical attention."  *Id*.  Defendants argue that the only civil rights violation plaintiff

---

[20] Amazingly enough, plaintiff states in his complaint that the fact that he had no documented mental disorders poses the question why he would "allegedly" bang his head against the wall at numerous times during the pat frisk. Compl. ¶ 7.  He refers to this allegation as "utterly ridiculous." *Id.*  Plaintiff answered his own question at the disciplinary hearing and in his statement to the psychologist.  The court understands that the psychologist testified "confidentially" at the disciplinary hearing, however, the plaintiff cannot use his confidential statements, yet not allow the rest of the statements to be discussed.

[21] Since there was no excessive force, defendant Hauck cannot be found liable for failure to intervene.

alleges is the incident on December 3, 2006, and that "[b]y definition, on event cannot

constitute a pattern."  (Dkt. No. 48, Memo. at 24).

Plaintiff has not alleged any facts relating to any alleged constitutional

violations other than the incident on December 3, 2006.  Plaintiff's allegations of a

pattern of civil rights abuses are merely conclusory allegations.  *See Kia P. v.

McIntyre*, 235 F.3d 749, 763 (2d Cir. 2000) ("A plaintiff may not survive a properly

asserted motion for summary judgment on the basis of conclusory allegations alone.).

Since this court has recommended dismissal of the Eighth Amendment claims for

denial of proper medical treatment and excessive force, plaintiff's conclusory claim of

a "pattern" of civil rights violations must also be dismissed.

## 7.   **Conditions of Confinement**

It is unclear whether plaintiff is claiming that the conditions of his confinement

during the suicide watch were unconstitutional.  He states in his complaint that he was

placed in a cell with a pad, but no mattress and the lights were very bright.[22] Compl.

¶ 5.  Plaintiff states that he was given "something like padding" to wear and was

refused any toilet paper.  Under the Eighth Amendment, an inmate has the right to be

free from conditions of confinement that impose an excessive risk to the inmate's

health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The Eighth

---

[22] Plaintiff states that they took his tinted glasses away, which made the bright light even more uncomfortable.

Amendment standard for conditions of confinement is similar to that for medical care.

As in the medical care and excessive force analyses, there is an objective and a subjective prong to the Eighth Amendment analysis with respect to conditions of confinement. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  Under the objective prong, the plaintiff must show that the deprivation was "sufficiently serious," and the subjective prong is satisfied by showing a sufficiently culpable state of mind on the part of the official responsible for the deprivation. *Id.*  In order to be sufficiently serious in a "conditions of confinement" case, the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. *Farmer*, 511 U.S. at 834.  In order to have the required state of mind, an official must be "deliberately indifferent" to a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 828.

In this case, plaintiff told defendant Fisher that plaintiff would be committing suicide, so plaintiff was placed on a one-on-one suicide watch.[23]  The suicide watch involves depriving the inmate of his regular clothing and belongings.  Even assuming that plaintiff's allegations regarding the conditions are completely true, the deprivation that he suffered would not rise to the level of a constitutional violation.

---

[23] It should be noted that it was Psychologist Rudder that recommended the suicide watch, based upon the notification that plaintiff had indicated that he would commit suicide that night. (Fisher Decl. Ex. B at 2) (SHU Log Book for 10:55 a.m. 12/3/06).  This is corroborated by the confidential testimony of Psychologist Rudder. (Roberts-Ryba Aff. Ex. C at 2).

Plaintiff was deprived of the regular mattress and his clothing overnight.[24]  Plaintiff

himself states that his belongings, including a mattress, sheets, and a blanket were

returned to him the next day, although not as quickly as he would have liked. Compl.

¶ 7.  The hours that plaintiff was without these materials simply did not deny plaintiff

the "minimal civilized measure of life's necessities."[25]  Thus, assuming plaintiff is

attempting to make an Eighth Amendment claim regarding the conditions of his

confinement for one day, any such claim may be dismissed.

    **WHEREFORE** it is hereby

    **RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No.

48) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Date: March 30, 2009

_____

Hon. Gustave J. DiBianco
U.S. Magistrate Judge

---

[24] Plaintiff also alleges that he was denied toilet paper.  Even if this were the case, the denial of toilet paper overnight for one night does not rise to the level of a constitutional violation.  The SHU Log Book indicates that plaintiff was removed from the "special watch" at 9:00 a.m. on December 4, 2006. Fisher Aff. Ex. B at 4.  The Log Book also indicates that "Mental Health" was on the unit to see plaintiff at 9:29 a.m., and that the one-on-one watch for plaintiff was "finished" at 10:28 a.m. on December 4th. *Id.* at 9.

[25] In fact, if plaintiff had actually been suicidal, it could have been a substantial risk to leave him in his cell with materials that he could use to harm himself.